# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal Case No. 13-155 (RJL) |
| | ) | |
| ROGER REDRICK, | ) | |
| | ) | **FILED** |
| Defendant. | ) | JUL - 3 2014 |
| | ) | Clerk, U.S. District & Bankruptcy |
| | | Courts for the District of Columbia |

## MEMORANDUM OPINION

July 3ʳᵈ, 2014 [## 6, 7]

Defendant Roger Redrick seeks to suppress all physical evidence seized during the execution of a search warrant at his apartment on April 30, 2013, including firearms and drugs, on the grounds that such evidence was seized in violation of his Fourth Amendment right to be free from unreasonable searches and seizures. *See* Def.'s Mot. to Suppress Evidence and Mem. of P. & A. ("Def.'s Mot. Suppress Evid.") [Dkt. # 6]; Def.'s Supplemental Mot. in Supp. of His Mot. to Suppress Tangible Evidence and Statements ("Def.'s Suppl. Brief") [Dkt. # 15]. He also seeks to suppress statements he made to law enforcement officers that day on the grounds that they were made in response to custodial interrogation without the preliminary warnings required by *Miranda v. Arizona*, 384 U.S. 436 (1966), and were not voluntary. *See* Def.'s Mot. to Suppress Statements and Mem. of P. & A. ("Def.'s Mot. Suppress Stmts.") [Dkt. # 7]; Def.'s Suppl. Brief. The Court held an evidentiary hearing on the defendant's two motions on September 17, 2013, at which Metropolitan Police Department ("MPD") Detectives John

Bolden and Kirk Delpo testified to the events surrounding the defendant's arrest, the protective sweep of his apartment, and his questioning both at his apartment and, later, at the police station. *See* Transcript of Sept. 17, 2013 Motion Hearing, *United States v. Redrick* ("Hr'g Tr.") [Dkt. # 12]. Upon careful consideration of the defendant's motions, the government's oppositions thereto, the testimony and arguments of counsel at the evidentiary hearing, the parties' supplemental pleadings, and the relevant law, the Court DENIES Defendant's Motion to Suppress Evidence, and GRANTS in part and DENIES in part Defendant's Motion to Suppress Statements.[1]

## BACKGROUND

Shortly after 6:00 a.m. on April 30, 2013, members of the Fugitive Task Force, including Deputy United States Marshals and MPD officers, arrived at the apartment of defendant Roger Redrick in Southeast Washington, D.C. to execute an arrest warrant for a parole violation related to his conviction for armed robbery. Hr'g Tr. at 4-5; Gov't's Opp'n to Def.'s Mots. to Suppress Evidence and Statements ("Gov't's Opp'n") [Dkt. # 10] at 2. The officers knocked on the door, a male voice asked "who is it?" and an officer responded "police," and a couple of minutes later Redrick opened the door. Hr'g Tr. at 5, 23-24; Gov't's Opp'n at 2-3.

---

[1] The Court gave its ruling from the bench during a January 8, 2014, status hearing. This memorandum opinion follows to explain the Court's rulings in greater detail. The defendant notified the Court on March 7, 2014 of his intention to plead guilty to Count 2 of the Indictment: Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1). The Court accepted the defendant's plea on March 18, 2014, and currently he awaits sentencing.

When Redrick opened the door, wearing pants but no shirt, the officers immediately arrested him at the threshold of the apartment and handcuffed him. Hr'g Tr. at 5, 25; Search Warrant Affidavit [Dkt. # 6-2] at 3. The officers then sat him down at the dining table in the combination living room/dining room, and they proceeded to conduct a protective sweep of the apartment to ensure that no other persons were present. The apartment is a one-bedroom apartment. The front door opens into a combination living room/dining room, which is open to a galley kitchen and a bathroom on the left-hand side. The bedroom is a separate room located straight back from this living area. *See* Gov't's Opp'n at Ex. A [Dkt. # 10-1] (Diagram of Apartment).

While three or four other officers were conducting a protective sweep of the apartment, MPD Detective John Bolden was standing next to the door of a closet in the living room/dining room, which was adjacent to the dining table where Redrick was seated. Hr'g Tr. at 28-29. Bolden heard a noise come from the closet, at which point he looked at the closet door and noticed that the throw rug in front of the door was bunched up. Hr'g Tr. at 10-11. Bolden checked the door, found it was locked, and asked Redrick a question about the closet. Bolden could not remember the wording of his question, but Redrick responded that maintenance had been there a couple days earlier. Hr'g Tr. at 12. At that point Bolden used his own knife to unlock the closet, drew his weapon, and opened the closet door. Hr'g Tr. at 12; Gov't's Opp'n at 3.

When he opened the closet door, Bolden saw that the closet was small and contained a water heater, but no person was hiding inside. Hr'g Tr. at 13. At that point, aware that no one was in the closet, Bolden asked Redrick a question, phrased either as

3

"is there anything I need to know about in this closet?", Hr'g Tr. at 13, or "is there anything in here I need to know about?", Hr'g Tr. at 46.[2] Redrick responded, "there is a piece in there," which Bolden understood to mean a gun. Hr'g Tr. at 13. Bolden then looked down and saw a gun box on the floor inside the closet, but did not move it. Hr'g Tr. at 13-14; Gov't's Opp'n at 3. According to Bolden, the total time that elapsed from when he heard the noise to when he saw the gun box after opening the closet was one or two minutes. Hr'g Tr. at 15.

Bolden alerted the other members of the team that he had found a gun box, and Deputy Marshal Versage called the Gun Recovery Unit to start the process of obtaining a search warrant. Hr'g Tr. at 16-17. Then another officer, Deputy Marshal Gause, asked Redrick if there was anything else they needed to know about, and Redrick responded that there was "coke" in the kitchen on top of the cabinet. Hr'g Tr. at 36; Gov't's Opp'n at 3. Gause then went to the kitchen, retrieved a small black bag from on top of a cabinet, opened it, and found a clear plastic bag containing a white rock substance. Hr'g Tr. at 36-37; Gov't's Opp'n at 3. He also found a green plastic wrap on the cabinet containing a white rock substance. Gov't's Opp'n at 3. When Gause brought the bags back into the living room/dining room, Redrick stated that there was a gun under the couch. Hr'g Tr. at 18; Gov't's Opp'n at 3-4. The officers then apparently lifted the couch and saw a

---

[2] The search warrant affidavit, sworn by MPD Sergeant Curt Sloan, notes that "it is standard procedure to ask the person if there is anything in the apartment or place that the police agents need to know about [during a protective sweep]." Search Warrant Affidavit at 3.

pistol on the floor, but did not move it.[3]  At no point before Redrick made these statements did the officers give him *Miranda* warnings.

At around noon, MPD obtained a search warrant for Redrick's apartment. *See* Search Warrant [Dkt. # 6-2] at ECF p. 6.  The police affidavit in support of the application for a search warrant relied on the discovery of the gun box and the drugs, as well as on Redrick's un-Mirandized statements, as the grounds for finding probable cause to search the apartment. *See* Search Warrant Affidavit at 1, 3.  During the execution of the search warrant, the police seized the gun box from the closet, which contained a Glock model 17 (9 mm) pistol, a loaded Glock model 22 (.40 caliber) pistol from under the couch, 227 grams of a white rock-like substance from the kitchen, which field tested positive for cocaine, a scale, and other drug paraphernalia. *See* Criminal Complaint [Dkt. # 1] and Statement of Facts [Dkt. # 1-1]; Search Warrant [Dkt. # 6-2] at ECF p. 6; Gov't's Opp'n at 4-6.

After his arrest, Redrick was brought to the police station to be interviewed. Gov't's Opp'n at 6.  MPD Detective Kirk Delpo interviewed Redrick at approximately 4:00 p.m.  Hr'g Tr. at 52.  After some preliminary discussion of the charges, Detective Delpo read the *Miranda* warnings to Redrick, and Redrick signed a *Miranda* waiver card

---

[3] There are conflicting accounts about whether officers actually lifted the couch and viewed the pistol before securing the search warrant.  The police's search warrant affidavit states that the police did not look for the second gun prior to obtaining the search warrant. *See* Search Warrant Affidavit at 4.  But the government's opposition brief represents that the police did, in fact, lift the couch and saw the gun after Redrick made that statement, and before the warrant was obtained. *See* Gov't's Opp'n at 4.  I decline to resolve this factual discrepancy unnecessarily (and without additional testimony) because it is not material to the disposition of the legal issues in this case, but for purposes of this opinion I will assume, *arguendo*, that the police did lift the couch and thereby conducted an additional search. *See infra* Section II.

at 4:52 p.m. *See* Gov't's Opp'n at Ex. B [Dkt. # 10-1] (*Miranda* Waiver Form); Hr'g Tr. at 52-56. During the subsequent interview, Redrick admitted that the guns and drugs discovered at the apartment were his and that he sells cocaine. Hr'g Tr. at 62-63, 73; *see also* Gov't's Opp'n at 6.

Redrick was charged by Criminal Complaint on May 1, 2013. On May 30, 2013, he was charged in a three-count Indictment with one count of Unlawful Possession with Intent to Distribute 28 Grams or More of Cocaine Base, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(iii), one count of Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1), and one count of Using, Carrying and Possessing a Firearm During a Drug Trafficking Offense, in violation of 18 U.S.C. § 924(c)(1). *See* Indictment [Dkt. # 4].

## ANALYSIS

The defendant moves to suppress the guns and drugs found at his apartment, as well as his statements, based on three alternative legal theories. First, he argues that the police's search of the closet in his apartment incident to his arrest exceeded the scope of a permissible warrantless "protective sweep." And since all physical evidence ultimately discovered in the apartment pursuant to a later-executed search warrant, as well as his statements, derived from that closet search, all physical evidence and statements must be suppressed as the fruit of the poisonous tree. *See* Def.'s Mot. Suppress Evid. at ECF pp. 1, 3-5. Second, and in the alternative, the defendant argues that even if opening the closet was within the scope of a valid protective sweep, that sweep ended before Detective

6

Bolden asked him a question without first giving him *Miranda* warnings, and, based on his response, discovered a gun box in the closet. Accordingly, the defendant's first unwarned statement and follow-on statements in the apartment must be suppressed as *Miranda* violations, and all physical fruits thereof must also be suppressed. *See* Def.'s Suppl. Brief at 8. Finally, the defendant claims that all of his statements, both those made at the apartment and those made during a later custodial interview at a police station, were involuntary, and therefore the statements and all physical evidence must be suppressed. *See* Def.'s Mot. Suppress Stmts. at 3-5; *see also* Hr'g Tr. at 58-60. For the reasons discussed below, the defendant's first and third arguments are meritless. His second argument, on the other hand, is correct in part. As a result, certain of his statements must be suppressed, but none of the physical evidence will be.

## I. The Protective Sweep and the Discovery of the Gun Box in the Closet

The defendant's legal arguments all hinge on the initial discovery of the gun box in the closet. As such, my first concern is the constitutionality of the police's protective sweep, Detective Bolden's first question to Redrick and his response, and the discovery of the gun box in the closet.

### a. The Protective Sweep

Redrick first argues that the warrantless "protective sweep" of his apartment was overbroad. The Fourth Amendment, of course, "prohibits only unreasonable searches and seizures." *United States v. Ford*, 56 F.3d 265, 268 (D.C. Cir. 1995). While the search of a home without a search warrant is generally *per se* unreasonable, *see id.*, there are exceptions to the warrant requirement, including that "officers executing an arrest

warrant may enter a dwelling given 'reasonable belief' that the suspect lives there and is present at the time." *United States v. Taylor*, 497 F.3d 673, 678 (D.C. Cir. 2007) (citing *United States v. Thomas*, 429 F.3d 282, 285-86 (D.C. Cir. 2005)); *see also Payton v. New York*, 445 U.S. 573, 603 (1980). And upon entering a dwelling to execute an arrest warrant, law enforcement officers may, without a search warrant or probable cause, conduct a "protective sweep," which is "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Maryland v. Buie*, 494 U.S. 325, 327 (1990). In keeping with the purpose of this exception to the warrant requirement—ensuring the safety of the arresting officers or other persons—a *Buie* protective sweep is "not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found," and it may last "no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id.* at 335-36.

The Supreme Court has sanctioned two types of protective sweeps. *Thomas*, 429 F.3d at 287 (citing *Buie*, 494 U.S. at 334). The first type, which may be conducted "as a precautionary matter and without probable cause or reasonable suspicion," limits officers to "look[ing] in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Buie*, 494 U.S. at 334. The second type, by contrast, "may extend beyond immediately adjoining spaces but must be based upon 'articulable facts which . . . would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.'" *Thomas*, 429 F.3d at 287 (quoting *Buie*, 494 U.S. at 334).

8

Here, Detective Bolden's search of the closet in Redrick's apartment was a valid protective sweep under either of the two types identified in *Buie*. First, Redrick was immediately arrested at the threshold of his apartment front door, which opens into the main living room/dining room area. The apartment was small, consisting of the living room/dining room, a galley kitchen, a bathroom, and a bedroom, and the closet in question was located in that living room/dining room next to the dining table at which Redrick was seated after being handcuffed. Accordingly, the closet was a place "from which an attack could be immediately launched" that was "immediately adjoining the place of arrest," and therefore the police could permissibly search it under the first type of protective sweep. *See Thomas*, 429 F.3d at 288 (upholding validity of first type of *Buie* protective sweep of bedroom where defendant was arrested in hallway immediately inside front door of his one-bedroom apartment, and the bedroom was "a straight shot down the hallway" from that spot); *Ford*, 56 F.3d at 270 (upholding validity of first type of *Buie* protective sweep of bedroom where defendant was arrested in hallway of apartment after emerging from that bedroom, which was immediately adjoining the hallway). In fact, *Buie* itself expressly identified closets as places that can be searched as part of a protective sweep if they "immediately adjoin[] the place of arrest," as this closet did here.[4] *See Buie*, 494 U.S. at 334. And, in any event, the apartment was small enough

_____

[4] Although it turned out that the closet contained a water heater and did not have enough room for a person to hide inside, the officers could not have known this before opening the closet door. Nor is it particularly relevant that the closet door was locked, since a person hiding inside might not have been locked in from that side of the door and thus could have launched an attack. *Cf. United States v. Davis*, 471 F.3d 938, 945 (8th Cir. 2006) (affirming district court's conclusion that police exceeded scope of lawful protective sweep by breaking into a padlocked closet because the officer who broke the lock acknowledged that nothing he observed indicated that

that the entirety of the apartment, including the closet, could be searched as part of a legitimate first type of *Buie* search. *See Thomas*, 429 F.3d at 288 ("If an apartment is small enough that all of it 'immediately adjoin[s] the place of arrest' and all of it constitutes a space or spaces 'from which an attack could be immediately launched,' then the entire apartment is subject to a limited sweep of spaces where a person may be found." (citation omitted)).

Moreover, the search of the closet was valid even under the more demanding second type of *Buie* protective sweep because Detective Bolden had a reasonable belief, based on specific and articulable facts, that the closet harbored an individual posing a danger to the officers. Specifically, Bolden testified that he heard a noise in the closet and saw the rug in front of the closet door bunched up. In addition, it took Redrick a few minutes to open the apartment door after the officers initially announced their presence, potentially giving Redrick time to hide another person in the closet. Taken together, these facts warranted a "reasonably prudent officer" in believing that a person could be hiding in the closet, and Bolden testified that he did, in fact, believe that. Hr'g Tr. at 13, 19, 40. In sum, Bolden's search of the closet falls within the scope of a valid protective sweep and thus was a permissible warrantless search.

### b. The Defendant's First Statement

Finding that the police permissibly searched the closet as part of a valid protective sweep does not end the Court's inquiry, however, because the record shows that

---

anyone was hiding in the closet, and that if someone had been hiding inside, the individual would have been locked in the closet because it was padlocked from the outside).

Detective Bolden did not actually see the gun box when he first opened the closet. Instead, after opening the closet and seeing no person inside, Bolden asked Redrick if there was anything in the closet he needed to know about, and Redrick responded, "there is a piece in there." Only then did Bolden look down and see the gun box in the closet. The next issue, therefore, is whether this question posed to Redrick before he received *Miranda* warnings violated his constitutional rights, and if so, whether the appropriate remedy includes suppression of the gun box—the physical evidence discovered as a result of this un-Mirandized statement.

To protect a suspect's Fifth Amendment right against self-incrimination, *Miranda* warnings must be given to an individual before he is subjected to custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 443-44 (1966). Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444. And interrogation includes not only "express questioning," but also "any words or actions . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). Absent any exception to the *Miranda* requirement, the police's failure to administer the warnings before a defendant is subjected to custodial interrogation requires the exclusion of his statements from evidence. *See Miranda*, 384 U.S. at 444; *Berkemer v. McCarty*, 468 U.S. 420, 429 (1984).

Here, there is no dispute that Redrick was in custody. Nor does the government contest that the express question "is there anything in here I need to know about?"

constituted interrogation. Instead, the government argues that an exception to the *Miranda* requirement applies. In the government's view, the protective sweep was still underway when, after opening the closet and seeing no one inside, Detective Bolden asked Redrick this question, and therefore it follows that the question falls within the "public safety exception" to *Miranda*. *See* Gov't's Opp'n at 10-12; Gov't's Supplemental Briefing in Opp'n to Def.'s Mots. to Suppress Evidence and Statements ("Gov't's Suppl. Brief") [Dkt. # 13] at 5. By contrast, Redrick argues that the protective sweep ended once Bolden opened the closet and confirmed that no person was located inside who might have posed a danger to the officers' safety. The follow-up question posed to Redrick could not have fallen within the public safety exception to *Miranda*, therefore, and in turn his response that "there is a piece in there" was obtained in violation of *Miranda* and must be suppressed. *See* Def.'s Suppl. Brief at 8-14. Although a close question, I find, for the following reasons, that the public safety exception does *not* apply to Detective Bolden's question here.

In *New York v. Quarles*, 467 U.S. 649 (1984), the Supreme Court recognized a "narrow exception" to the *Miranda* rule, holding that the requirement of giving *Miranda* warnings before questioning should not apply to "a situation in which police officers ask questions reasonably prompted by a concern for the public safety," or for the safety of the arresting officers. *Quarles*, 467 U.S. at 656, 658-59. In *Quarles*, a woman approached two police officers in their car, told them she had just been raped by a man carrying a gun, described the suspect, and told them he had just entered a nearby supermarket. *Id.* at 651-52. One officer pursued the suspect inside the supermarket, and upon apprehending

12

and frisking him, discovered he was wearing an empty shoulder holster. *Id.* at 652. After handcuffing the suspect but before giving him *Miranda* warnings, the officer asked him where the gun was. *Id.* The suspect nodded towards some empty cartons and responded, "the gun is over there," and the officer retrieved a pistol from one of the cartons. *Id.* In reversing the lower courts' exclusion of that statement from evidence, the Supreme Court reasoned that the police had reason to believe the suspect had just removed the gun from his holster and discarded it in the supermarket, and "[s]o long as the gun was concealed somewhere in the supermarket, with its actual whereabouts unknown, it obviously posed more than one danger to the public safety: an accomplice might make use of it, a customer or employee might later come upon it." *Id.* at 657. In such circumstances, "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *Id.*[5]

Our Circuit Court has addressed the public safety exception only twice. In *United States v. Brown*, 449 F.3d 154 (D.C. Cir. 2006), the court found, with little discussion, that the public safety exception applied when police officers apprehended a suspect moments after he had robbed a bank at gunpoint and then asked him the location of the gun before giving him *Miranda* warnings. *Brown*, 449 F.3d at 159, *abrogated in part on other grounds by Dean v. United States*, 556 U.S. 568 (2009). Three years later, in *United States v. Jones*, 567 F.3d 712 (D.C. Cir. 2009), the court elaborated on the scope

---

[5] The Supreme Court also made clear that whether the public safety exception applies is an objective inquiry—an officer's subjective motivation for asking a question is irrelevant to the applicability of the exception. *Quarles*, 467 U.S. at 655-56.

of the exception and again held that the exception applied, this time to an officer's

question whether a suspect had "anything on" him. *Jones*, 567 F.3d at 715. In *Jones*,

approximately twenty-one members of the U.S. Marshals Service Fugitive Task Force

traveled to an area of Washington, D.C. to execute an arrest warrant for the defendant on

a charge of first-degree murder. *Id*. at 713. In their pre-operation briefing, the officers

learned that the defendant had committed the murder with a handgun, might also possess

a second firearm taken from the murder victim, and had previous convictions for gun and

drug offenses. *Id*. When the officers arrived at the area—"characterized as 'an open-air

drug market' and 'a very dangerous part of the city'"—it was "filled with people," and

when the defendant saw them he fled on foot. *Id*. One officer chased the defendant,

heard a gunshot while in pursuit, and then saw the defendant enter the stairwell of an

apartment building, from which two small children emerged. *Id*. The officer then

entered the semi-lit stairwell, where he found the defendant and tackled him. *Id*. Within

thirty seconds of apprehending him—and before handcuffing him, giving him *Miranda*

warnings, or conducting a full pat-down search—the officer asked the defendant, who

was wearing a bulky jacket, whether he had "anything on" him. *Id*. He replied, "I have a

burner in my waistband," and a second officer then retrieved a firearm from the

defendant's waistband. *Id*. at 714.

In analyzing whether the officer's question fell within the public safety exception,

our Circuit Court made clear that a court must consider the "totality of the circumstances"

confronting the questioning officer. Highlighting all of the factual circumstances at play

in *Jones*, the court found that "in combination" they "clearly establish[ed]" that the

officer's question "fell squarely within the public safety exception." *Id.* at 715. The court nonetheless went on to discuss, "[w]ithout necessarily endorsing them," factors that other Circuits have emphasized when finding the public safety exception applies, including: (1) the defendant's prior criminal record, (2) the defendant's drug dealing, (3) the fact that the defendant was not yet handcuffed, and (4) the dangerous nature of the neighborhood where the defendant was arrested. *Id.* at 715-16. The court concluded that all four of these factors were present in *Jones*, in addition to the other circumstances it had listed. *Id.*

In the instant case, the circumstances surrounding Detective Bolden's question to Redrick differ sharply from those present in *Quarles*, *Brown*, and *Jones*, and based on the totality of the circumstances, I find that this question does not fall within the narrow public safety exception. How so?

First, although Redrick had a prior conviction for armed robbery of which the arresting officers were aware, *see* Hr'g Tr. at 4-5, the officers were executing an arrest warrant for a parole violation and had no particular reason to think Redrick might be armed. That fact distinguishes this case from *Jones*, where police were seeking a suspect who, though he also had prior gun and drug offenses, was being sought in connection with a much more severe crime—a murder that had taken place just two weeks earlier—and who police had reason to believe might possess two firearms. And Redrick's circumstances are even further removed from those at play in *Quarles* and *Brown*, where the arresting officers knew that the suspect had just committed a crime with a gun and might still possess it or have discarded it nearby.

Most important to my decision, however, are two other factors: by the time Bolden asked the question, (1) Redrick was handcuffed, and (2) the protective sweep of the apartment was over and had confirmed that no other persons were present. Accordingly, there was *no* ongoing threat to the safety of the officers or other persons that could have "reasonably prompted" the question. The record shows that the officers handcuffed Redrick immediately when he answered the door, semi-dressed, early in the morning, and well before Bolden asked the question, and therefore Redrick himself posed little to no risk of reaching for a concealed weapon. *See United States v. Mobley*, 40 F.3d 688, 693 (4th Cir. 1994) (public safety exception did not apply where: "[defendant] was encountered naked; by the time he was arrested, the FBI already had made a security sweep of his premises, and they had found that he was the sole individual present, and that the apartment was a residence for Mobley alone"; and then FBI agent asked him if there were any weapons present as he was "being led away"); *cf. Jones*, 567 F.3d at 715 (factors that "further heightened the threat to public safety" included that the suspect had not yet been handcuffed when officer asked him the question and was wearing a bulky jacket that could conceal a weapon).

Next, at the time Bolden asked the question, the officers had completed their protective sweep and confirmed that no other persons were present in the apartment.[6]

---

[6] The government points to cases where the public safety exception was found to apply even though a defendant was handcuffed at the time the question was asked. *See* Gov't's Opp'n at 12 (citing *United States v. Newton*, 369 F.3d 659, 678 (2d Cir. 2004) and *United States v. Williams*, 181 F.3d 945, 953-54 (8th Cir. 1999)). But those cases are readily distinguishable from this case because they involved situations either where other persons besides the defendant were present at the place of arrest who might have accessed a weapon (*Newton*) or where the police did not yet know whether any other persons were present (*Williams*).

Detective Bolden testified that the other officers were completing or "finishing up" the protective sweep of the other rooms in the small apartment—*i.e.* the galley kitchen, bathroom, and bedroom—and coming back out into the living room/dining room when he heard the noise in the closet. Hr'g Tr. at 9, 15, 29. At that point in time, then, there was no indication that any other persons besides Redrick and the officers were present in the apartment, and by the time Bolden actually opened the closet moments later, the closet was the last place to be searched as part of the protective sweep.[7] Therefore, when Bolden *first* looked into the closet and confirmed that no person was present, any concern for officer safety was vitiated, and the protective sweep ended. *See Buie*, 494 U.S. at 335-36 (protective sweep "may extend only to a cursory inspection of those spaces where a *person* may be found" and may last "*no longer* than is necessary to dispel the reasonable suspicion of danger" (emphasis added)); *cf. Ford*, 56 F.3d at 270 (FBI agent's lifting of mattress did not fall within permissible protective sweep because agent never suggested in his testimony that a person might have been hiding under the mattress and in fact testified that it would have been "[v]irtually impossible" to do so). Indeed, Bolden testified that he knew no one was in the closet by the time he asked Redrick the question,

---

[7] To be fair, Detective Bolden's testimony on the timing sequence is somewhat ambiguous. He specifically testified that at the time he heard the noise in the closet, the other officers "were finishing up the back side." Hr'g Tr. at 29; *see also id.* at 9. But he also testified that *one or two minutes* elapsed from the time he heard a noise in the closet, asked Redrick a question about the closet, picked the lock, opened and visually inspected the closet, asked Redrick the challenged question, and then saw the gun box—all this while the other officers in his team were sweeping the rest of the apartment. *See* Hr'g Tr. at 15. It simply strains credulity to think that in that time frame three to four other officers had not yet completed the rest of the sweep looking for any other persons in the three other small rooms in a small one-bedroom apartment. Consequently, I am convinced that the protective sweep of the rest of the apartment was complete by the time Bolden opened the closet.

as the closet was small and a water heater occupied most of it, and he could not articulate any other potential risk to officer safety about which he was still concerned at that point. Hr'g Tr. at 13, 33, 47.[8] Under the circumstances of this case, I conclude that at the point in time the protective sweep ended, the public safety exception to *Miranda* could no longer apply to any questions asked of Redrick.[9]

Despite these clear implications of Bolden's testimony, the government nonetheless maintains that the protective sweep was still ongoing when Bolden posed his question—and, by extension, there was an ongoing concern for officer safety that made the public safety exception applicable—and urges this Court not to "Monday morning quarterback" the decision of the on-scene officer who faced a "fluid" situation and was still subjectively concerned about officer safety at the time he asked the question. *See* Hr'g Tr. at 13, 19, 47-48; Gov't's Opp'n at 10-12; Gov't's Suppl. Brief at 8-9. While I do not doubt or downplay the safety risks that law enforcement officers routinely face when searching premises, our Circuit Court has cautioned that courts "must . . . take care

---

[8] Bolden nevertheless testified that he was "still concerned" at the time he asked the question. Hr'g Tr. at 48; *see also id.* at 13, 19, 47-48. The Court does not doubt the veracity of Bolden's testimony, but the public safety exception inquiry does not turn on the subjective intent of the questioning officer. *See Quarles*, 467 U.S. at 655-56.

[9] In reaching this conclusion, I do not mean to suggest that these two distinct legal inquiries are coextensive, or that the public safety exception categorically can never apply to questions posed by officers after a protective sweep ends. *See, e.g., United States v. Are*, 590 F.3d 499, 505-07 (7th Cir. 2009) (finding public safety exception applied even after protective sweep ended). Nonetheless, both inquiries turn on the presence of an objective safety risk to officers or others, and in this particular case they overlap extensively because, once the protective sweep ended, there were simply no other reasonable safety concerns that could make the public safety exception apply. *See Mobley*, 40 F.3d at 693 (rejecting public safety exception where defendant was arrested alone in his apartment, and the FBI had already completed a security sweep of his premises before the challenged question was asked).

that the [public safety] exception not be applied so routinely as to swallow the rule." *Jones*, 567 F.3d at 717. As such, I think it prudent to heed that advice in circumstances like those presented in this case. Accordingly, since there was no reasonable concern for the safety of the officers (or others) to justify excepting Bolden's question from the requirements of *Miranda*, Redrick's statement that "there is a piece in there" was obtained in violation of *Miranda* and must be suppressed.

### c. The Gun Box in the Closet

This brings me to the physical evidence derived from that un-Mirandized statement: must the gun box in the closet, which Detective Bolden would not have seen but for Redrick's statement, also be suppressed along with the statement itself? Because the physical fruits of a suspect's un-Mirandized but voluntary statements are not excludable under the "fruit of the poisonous tree" doctrine, *Wong Sun v. United States*, 371 U.S. 471 (1963), the answer must be "no." *See United States v. Patane*, 542 U.S. 630, 634 (2004) (plurality opinion) ("the *Miranda* rule protects against violations of the Self-Incrimination Clause, which . . . is not implicated by the introduction at trial of physical evidence resulting from voluntary statements"); *id.* at 641 ("Potential [*Miranda*] violations occur, if at all, only upon the admission of unwarned statements into evidence at trial."); *id.* at 645 (Kennedy, J., concurring) ("Admission of nontestimonial physical fruits (the Glock in this case) . . . does not run the risk of admitting into trial an accused's coerced incriminating statements against himself."). Excluding Redrick's statement "is a complete and sufficient remedy" for the *Miranda* violation that occurred, and therefore it is unnecessary to exclude the physical fruit of that unwarned statement so long as it was

19

voluntary and the search and seizure were otherwise lawful. *See Patane*, 542 U.S. at 641-42 (citation omitted).

Here, Redrick's statement was voluntary, as will be discussed later in the opinion. *See infra* Section III. And the search and seizure were indeed lawful because, in light of my holding above that the scope of the permissible protective sweep included opening and searching the closet, the police could have seized the gun box under the "plain view" doctrine without any further warrantless search occurring.[10] *See Horton v. California*, 496 U.S. 128, 134-37 (1990) (plain view exception to warrant requirement); *Taylor*, 497 F.3d at 675, 679 (seizure of gun case found underneath bed after police lifted blanket off of bed during valid protective sweep was proper under plain view doctrine); *Ford*, 56 F.3d at 270 (once officer entered apartment bedroom pursuant to a legitimate *Buie* protective sweep, he could seize a gun clip found in plain view on the bedroom floor); *United States v. Curtis*, 239 F. Supp. 2d 1, 3 (D.D.C. 2002) ("officers engaged in a legitimate protective sweep need not close their eyes to what they see in plain view and . . . such objects may be admitted in evidence without violating the Fourth Amendment"). Accordingly, the gun box need not be excluded.

---

[10] In this case the officers opted to leave the gun box in the closet undisturbed until they secured a search warrant, but under the law of our Circuit, the police could have not only seized it but also proceeded to open it without a warrant. *See Taylor*, 497 F.3d at 679-80 (reaffirming the Circuit's prior holding that "gun cases and similar containers support no reasonable expectation of privacy if their contents can be inferred from their outward appearance," and affirming the district court's denial of defendant's motion to suppress where police found a gun case in plain view underneath bed during valid protective sweep and then opened the gun case without first securing a warrant).

## II.	The Defendant's Subsequent Statements in the Apartment, and the Discovery of Drugs in the Kitchen and a Second Gun Under the Couch

That brings me to the police's follow-up question to the defendant, his response, and the subsequent discovery of drugs and the second gun. Following Detective Bolden's first question to Redrick and his discovery of the gun box in the closet, a different officer, Deputy Marshal Gause, asked Redrick if there was anything else the officers needed to know about. Redrick initially responded that there was coke in the kitchen. Then, when the officer returned to the room with the drugs, Redrick stated that there was a gun under the couch.

Both of these statements must be suppressed as violations of *Miranda*. In view of my conclusion that Bolden's first question did not fall within the public safety exception, this follow-up question—asked *even later* in time after the protective sweep had concluded—was not reasonably prompted by a concern for the public safety or the safety of the arresting officers, and thus does not fall within the exception either. *Cf. Jones*, 567 F.3d at 716 (officer's actions bolstered conclusion that his question related to safety concerns when he asked the question within thirty seconds of apprehending defendant and did *not* ask follow-up questions).

As such, the next issue to be considered is whether the physical evidence discovered as a result of this second *Miranda* violation must also be suppressed. Once again, the answer is "no." To be sure, the police's retrieval of the drugs from the kitchen, their opening of the black bag, and their lifting of the couch to see the second gun were warrantless searches that were conducted after the protective sweep concluded, and,

absent any other exception to the warrant requirement, violated Redrick's Fourth Amendment rights. But this physical evidence is nonetheless admissible under the doctrine of "inevitable discovery."

The inevitable discovery exception to the exclusionary rule allows evidence initially detected as the result of unlawful government conduct to be introduced nonetheless "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444 (1984) (holding that exclusionary rule did not apply to evidence regarding the location and condition of murder victim's body, even though defendant's statements regarding the same were suppressed due to a violation of his Sixth Amendment rights, because a search party—which had ceased its search once defendant agreed to lead police to the body—inevitably would have found the body anyway). Here, the discovery of the gun box—which, as I held above, is admissible evidence despite the *Miranda* violation that led to its discovery—gave the police probable cause to obtain a search warrant. *See United States v. Warren*, 42 F.3d 647, 652 (D.C. Cir. 1994) (probable cause for search warrant requires only "'fair probability that contraband or evidence of a crime will be found in a particular place'") (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)); *United States v. Whichard*, 304 Fed. App'x. 887, 888 (D.C. Cir. 2008) (discovery of crack cocaine in plain view during protective sweep provided adequate basis for search warrant). And the police would have obtained a search warrant and turned up the drugs and second gun when executing that warrant had they not illegally discovered those items first. Indeed, the record shows that the police initiated

the process of securing a search warrant before, or at about the same time as, the Deputy Marshal posed his follow-up question to Redrick and the drugs and second gun were found, *see* Hr'g Tr. at 16-17, and therefore the officers were actively pursuing independent lawful means of searching the apartment before the illegal search occurred. *See United States v. Holmes*, 505 F.3d 1288, 1293-94 (D.C. Cir. 2007) ("'inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification'"; the government's showing that discovery was inevitable must be "more than [a] possibility" (quoting *Nix*, 467 U.S. at 444 n.5)).[11] Accordingly, the physical evidence discovered as a result of this second *Miranda* violation—the drugs and the second gun—is admissible under the inevitable discovery doctrine. And all of

---

[11] Although the search warrant affidavit ultimately referenced the illegally-discovered drugs and second gun, as well as the defendant's unwarned statements, *see* Search Warrant Affidavit at 1, 3, this illegally obtained information does not sufficiently taint the search warrant so as to render the doctrine of inevitable discovery inapplicable. First, I find that the permissibly-discovered gun box alone would have provided sufficient independent grounds for probable cause to secure a search warrant. *See supra* p. 22; *see also United States v. Murray*, 487 U.S. 533, 542 (1988) (under independent source doctrine, evidence which is initially discovered during an illegal search, but is subsequently acquired through an independent and lawful search warrant, is admissible at trial unless "the agents' decision to seek the warrant was prompted by [the illegally obtained information], or if [that illegally obtained] information . . . was presented to the [judge] and affected his decision to issue the warrant"); *see also United States v. Halliman*, 923 F.2d 873, 880-81 (D.C. Cir. 1991). And second, because "[p]otential [*Miranda*] violations occur, if at all, only upon the admission of unwarned statements into evidence at trial," *Patane*, 542 U.S. at 641 (plurality opinion), and because, in turn, the fruit of the poisonous tree doctrine does not apply to the physical fruits of un-Mirandized but voluntary statements, *see supra* pp. 19-20, the police may, as they did here, use such unwarned statements to help establish probable cause in a search warrant affidavit. *See United States v. Phillips*, 468 F.3d 1264, 1266 (10th Cir. 2006) (since the physical fruits of an unwarned but voluntary statement are admissible, it is "immaterial" whether the statement leads directly to discovery of the physical evidence or instead is used to obtain a search warrant, which then uncovers the physical evidence); *see also United States v. Patterson*, 812 F.2d 1188, 1193 (9th Cir. 1987).

the other physical evidence and contraband subsequently found in the apartment is also admissible because it was discovered pursuant to a valid search warrant.

## III.   Voluntariness of the Defendant's Statements

Finally, Redrick argues that all of the statements he made at his apartment were not voluntary, *see* Def.'s Mot. Suppress Stmts. at 3-4, which, if true, would require suppression of not only his statements, but also all physical evidence derived from those statements.[12]  He also argues that statements he made during his custodial interview at the police station must be suppressed because they were not voluntary and were "tainted" by the police's failure to give him *Miranda* warnings earlier in the day.  *See* Def.'s Mot. Suppress Stmts. at 3-5; Def.'s Suppl. Brief at 15; Hr'g Tr. at 58-60.  Both arguments are meritless, and I address them together because they both turn on the issue of voluntariness.

A defendant's statement is inadmissible "if under the totality of the circumstances it was involuntarily obtained."  *United States v. Reed*, 522 F.3d 354, 358-59 (D.C. Cir. 2008) (citation and quotation marks omitted).  Whether a statement was involuntary depends "on whether the 'defendant's will was overborne' when he gave [it]," *United States v. Murdock*, 667 F.3d 1302, 1305 (D.C. Cir. 2012) (quoting *Schneckloth v.*

---

[12] In contrast to the treatment of physical fruits of un-Mirandized but voluntary statements discussed above, the Fifth Amendment does require the exclusion of physical fruits of *involuntary* statements. *See Patane*, 542 U.S. at 640 (plurality opinion) ("We have repeatedly explained 'that those subjected to coercive police interrogations have an *automatic* protection from the use of their involuntary statements (or evidence derived from their statements) in any subsequent criminal trial.'" (quoting *Chavez v. Martinez*, 538 U.S. 760, 769 (2003) (plurality opinion))); *id.* at 644 ("the [Supreme] Court requires the exclusion of the physical fruit of *actually coerced* statements" (emphasis added)).

*Bustamonte*, 412 U.S. 218, 226 (1973)), but, importantly, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause," *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). And in this case, there is simply no evidence of "the crucial element of police overreaching" that would render any of Redrick's statements involuntary. *See Connelly*, 479 U.S. at 163.

### a. The Defendant's Statements in the Apartment

As to the statements he made at his apartment, Redrick notes only that he was subjected to custodial interrogation without receiving *Miranda* warnings and without the presence of counsel. *See* Def.'s Mot. Suppress Stmts. at 3-4. That is accurate, but it is insufficient: although the "[f]ailure to administer *Miranda* warnings creates a presumption of compulsion," *Oregon v. Elstad*, 470 U.S. 298, 307 (1985), that failure "in and of itself does not render a confession involuntary," *Quarles*, 467 U.S. at 655 n.5. *See also Murdock*, 667 F.3d at 1306 ("The detective's failure to honor [defendant's] *Miranda* right is certainly relevant to whether [defendant's] statements were voluntary, but it is insufficient by itself to establish involuntariness.").

Next, and more importantly, the record does not reflect that the police used any coercive tactics while at Redrick's apartment. The officers handcuffed him and seated him at a table while they conducted a protective sweep—typical events incident to an arrest—and thereafter they asked him if there was anything in the closet and the apartment they needed to know about. But simply being handcuffed does not render one's statements involuntary. *See United States v. Mohammed*, 693 F.3d 192, 198 (D.C. Cir. 2012) ("no court has found that [*Miranda*] waivers made while a suspect is

handcuffed are invalid for that reason alone, . . . much less that statements obtained while handcuffed are themselves involuntary"). In fact, "egregious facts [are] necessary to establish that the statements [the defendant] made during questioning were involuntary." *Id.* And here there is simply no evidence whatsoever that the officers made promises or threats to Redrick, or used any physical or psychological pressure to coerce him into making his statements. *Compare Mincey v. Arizona*, 437 U.S. 385, 398-400 (1978) (finding confession involuntary where detective gave *Miranda* warnings but persisted in questioning defendant who had been wounded a few hours earlier, was in a hospital bed in an intensive care unit encumbered by tubes and needles, was complaining of intense pain, gave confused and incoherent responses, and repeatedly asked that the interrogation stop until he could get a lawyer), *with Berghuis v. Thompkins*, 560 U.S. 370, 386-87 (2010) (finding no coercion in a three-hour interrogation absent evidence "that police threatened or injured [the defendant] during the interrogation or that he was in any way fearful"), *and Mohammed*, 693 F.3d at 198 (finding statements voluntary even though the defendant may have been handcuffed during two-hour interrogation and DEA agents lied to him that his hands tested positive for heroin; the DEA agents "did not threaten or intimidate [the defendant]"), *and Reed*, 522 F.3d at 359 (finding confession voluntary because district court credited FBI agent's testimony that defendant was not hit in the face and was given a blanket when placed in a cold room, and defendant's remaining allegation—that he was forced to wear a jumpsuit without underwear—did not rise to the level of coercion).

### b. The Custodial Interview

Turning to the custodial interview at the police station following his arrest, Redrick also moves to suppress incriminating statements he made during that interview about the guns and drugs found in his apartment. *See* Def.'s Mot. Suppress Stmts. at 4-5; Def.'s Suppl. Brief at 15. As a preliminary matter, there is no dispute that the police gave Redrick *Miranda* warnings prior to this interview and that he signed a *Miranda* waiver card. *See* Gov't's Opp'n at Ex. B (*Miranda* Waiver Form); Hr'g Tr. at 52-56; Gov't's Opp'n at 14-15; Def.'s Mot. Suppress Stmts. at 5. He nonetheless argues that any post-warning statements he made during this interview were "tainted" by the police's failure to give him *Miranda* warnings earlier in the day when he made unwarned, incriminating statements in response to their questions. *See* Def.'s Mot. Suppress Stmts. at 5; Def.'s Suppl. Brief at 15. This argument is unconvincing, and more importantly, the Supreme Court squarely rejected it *Oregon v. Elstad*, 470 U.S. 298 (1985).

In *Elstad*, the Supreme Court considered whether an officer's initial failure to administer *Miranda* warnings, without more, taints subsequent admissions made by the defendant after he has received *Miranda* warnings and waived those rights. The Court held that "there is no warrant for presuming coercive effect" when a defendant's initial, unwarned statement is voluntary. *Elstad*, 470 U.S. at 318. Instead, "[t]he relevant inquiry is whether, in fact, the second statement was also voluntarily made." *Id.* And "[a] subsequent administration of *Miranda* warnings to a suspect who has given a

voluntary but unwarned statement ordinarily should suffice to remove the conditions that

precluded admission of the earlier statement." *Id.* at 314.[13]

---

[13] The Supreme Court more recently considered a sequential confession situation in *Missouri v. Seibert*, 542 U.S. 600 (2004). In that case, the police employed a two-step interrogation protocol in which they first questioned a suspect without giving *Miranda* warnings until she confessed to murder, then advised her of her *Miranda* rights "midstream" and covered the same ground a second time to produce a warned confession. *See Seibert*, 542 U.S. at 604. The Court held that the second confession was inadmissible, with a plurality focusing on whether the midstream *Miranda* warnings "could be effective enough to accomplish their object" in light of "a series of relevant factors" in a given case, *id.* at 615 (plurality opinion), while Justice Kennedy, concurring in the judgment, proposed "a narrower test applicable only in the infrequent case . . . in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning," under which he would exclude the second confession unless "curative measures" were taken before it was made, *id.* at 622 (Kennedy, J., concurring). Unlike in *Seibert*, however, in Redrick's case there is no indication that the police deliberately used a two-step interrogation technique or that his statements at the police station proceeded directly from his statements at his apartment. Redrick made his unwarned statements shortly after the police began searching his apartment at approximately 6:00 a.m., but his interview at the police station did not occur until several hours later, at approximately 4:00 p.m. Moreover, the officer who conducted the interview, Detective Delpo, was not present at the arrest or at the execution of the search warrant, and he testified that he only had "vague" information about the arrest and search warrant before interviewing the defendant. *See* Hr'g Tr. at 67, 72-73. Thus, far from Redrick's unwarned statements and subsequent warned statements being part of "a continuum," *see Seibert*, 542 U.S. at 617, there was a significant break in time and circumstances between the two. *See id.* at 615-16 (plurality opinion) (the timing and setting of the first and second interrogations, as well as the continuity of police personnel, are "relevant facts" that "bear on whether *Miranda* warnings delivered midstream could be effective"); *id.* at 622 (Kennedy, J., concurring) ("a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning may suffice in most circumstances" to "ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver"); *see also Bobby v. Dixon*, 132 S. Ct. 26, 31-32 (2011) (noting that no two-step interrogation of the type at issue in *Seibert* occurred where there was a "significant break in time and dramatic change in circumstances" between the defendant's unwarned statements and his second, warned interrogation when, in between, four hours passed, the defendant traveled from a police station to another jail and back again, he claimed to have spoken to his lawyer, and he learned that police were talking to his accomplice and had discovered the murder victim's body). Accordingly, *Elstad*'s voluntariness inquiry remains the appropriate analysis for the sequential confession in the instant case. *See Seibert*, 542 U.S. at 622 (Kennedy, J., concurring) ("The admissibility of postwarning statements should continue to be governed by the principles of *Elstad* unless the deliberate two-step strategy was employed."); *United States v. Stewart*, 388 F.3d 1079, 1090 (7th Cir. 2004) ("Where the initial violation of *Miranda* was not part of a deliberate strategy to undermine the warnings, *Elstad* appears to have survived *Seibert*.").

Here, as discussed above, the prior unwarned statements in the apartment were voluntary. Therefore, the statements Redrick made after waiving his *Miranda* rights are also admissible so long as they were voluntary. They were. First, there was a significant passage of time, change of location, and change of police personnel between his early morning statements in his apartment and his late afternoon custodial interview at the police station. *See supra* note 13; *cf. Elstad*, 470 U.S. at 310 (noting that "[w]hen a prior statement is *actually coerced*, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession"). And second, once again the record is devoid of any indicia of coercion. On the contrary, the sole interviewing officer, Detective Delpo, provided Redrick with water, explained to him multiple times that he could stop the interview at any time, and did not make any promises or threats. *See* Hr'g Tr. at 54-56, 65. In fact, Delpo described Redrick and the interview atmosphere as "relaxed," and at no point during the hour-long interview did Redrick ask to stop or ask for an attorney. *See* Hr'g Tr. at 64-65. Under these circumstances, the defendant's will was not overborne, and therefore his statements during the custodial interview were voluntary and will not be suppressed.

## CONCLUSION

Thus, for the foregoing reasons, the Court DENIES Defendant's Motion to Suppress Evidence [Dkt. # 6], and GRANTS in part and DENIES in part Defendant's Motion to Suppress Statements [Dkt. # 7]. A separate order consistent with this Memorandum Opinion shall issue this date.

RICHARD J. LEON
United States District Judge