**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 13-155 (RJL)** |
| | ) | |
| **ROGER REDRICK,** | ) | |
| **Defendant.** | ) | |

**UNITED STATES' OPPOSITION TO DEFENDANT'S *PRO SE* EMERGENCY**
**MOTION FOR COMPASSIONATE RELEASE TO HOME CONFINEMENT**
**PURSUANT TO 18 U.S.C. § 3582(c)(1)(a)(i) PERTAINING TO COVID-19**

The United States of America, by and through its attorney, the United States Attorney for

the District of Columbia, respectfully files this opposition to defendant Roger Redrick's May 12,

2022, *pro se* motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A) (ECF 60).

**OVERVIEW**

Defendant seeks immediate release in this matter. He claims that his high blood pressure

and claimed heart disease increase his "risk of severe complications [from] COVID-19," and thus

constitute "extraordinary and compelling reasons" for early release under 18 U.S.C.

§ 3582(c)(1)(A)(i) (Mot. at 3). He further contends that the 18 U.S.C. § 3553(a) factors support a

sentence reduction (*id.* at 4). Defendant acknowledges that he failed to seek an administrative

remedy from the Bureau of Prisons (BOP) before filing his motion and argues that the Court can

"dispense with" the requirement (*id.*).

We respectfully disagree on all points. As discussed herein, defendant failed to exhaust his

administrative remedies, and there is no basis to disregard that requirement. Defendant's medical

records contain a diagnosis of hypertension, but they do not indicate a diagnosis of heart disease.

Moreover, defendant received both initial doses of the Moderna COVID-19 vaccine in March 2021

and is thus fully vaccinated against COVID-19. Accordingly, defendant has not established an

1

extraordinary and compelling reason for a sentence reduction. Defendant's motion also fails because the 18 U.S.C. § 3553(a) factors do not weigh in favor of his release. Therefore, for this additional reason, this Court should summarily deny defendant's request for immediate release.

## I.    ADDITIONAL BACKGROUND

### A. The Instant Offense

The facts of this case are described in detail in the Statement of Offense (ECF 21 at 2-4), the PSR (ECF 25 at 5-6), and the government's memorandum in aid of sentencing (ECF 24 at 1-2). In short, on April 20, 2013, deputy United States Marshals and other law enforcement officers attempted to execute an arrest warrant – stemming from a parole-violation warrant – at defendant's the home in Washington, D.C. When the police arrived, defendant opened the door and was immediately detained inside the home. The officers conducted a protective sweep of the home, during which a detective observed a throw rug bunched up in front of a closet door and heard a noise within the closet, suggesting that someone may be inside the closet. The officers breached the closet door, expecting to find someone inside the closet, but did not. After opening the closet door, the detective asked defendant whether there was anything in the closet that the officers should know about. Defendant stated that there was a gun inside the closet.

Officers obtained a search warrant for the property and, during the execution of the warrant, seized the following items: (1) approximately 222 grams of cocaine base, (2) a quantity of loose cocaine powder, (3) an unloaded black Glock nine-millimeter semiautomatic handgun, (4) a loaded black Glock .40 caliber handgun containing 12 rounds of ammunition, (5) two loose cartridges of .38-special ammunition, (6) 100 rounds of .40-caliber ammunition, (7) assorted drug paraphernalia and cutting agents, and (8) $24,454 in United States currency. After waiving his *Miranda* rights,

defendant admitted to law enforcement that the contraband seized during the execution of the warrant belonged to him and, further, that he made his living selling cocaine.

On May 30, 2013, the government filed a three-count federal grand jury indictment charging the defendant with: (1) Unlawful Possession with Intent To Distribute 28 Grams or More of Cocaine Base, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(iii) (Count One); (2) Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1) ("FIP") (Count Two); and (3) Unlawful Possession of a Firearm During a Drug Trafficking Offense, in violation of 18 U.S.C. § 924(c)(1) (Count Three) (ECF 4).

On March 18, 2014, the defendant entered a plea of guilty to Count Two of the Indictment (ECF 20). On July 17, 2014, this Court accepted the plea agreement and sentenced defendant to 188 months of incarceration (see Docket Entry dated Jul. 17, 2014; ECF 34). His anticipated release date is September 5, 2026 (Sentence Computation, Gov. Ex. 1 at 2)

On July 29, 2014, defendant noted an appeal (ECF 36). On November 8, 2016, the Court of Appeals for the D.C. Circuit affirmed his conviction. *See United States v. Redrick*, 841 F.3d 478, 480, 485 (D.C. Cir. 2016).

On March 4 and March 30, 2021, defendant received both initial doses of the Moderna COVID-19 vaccine (2021 medical records, Gov. Ex. 2 at 36).

On May 12, 2022, defendant moved *pro se* for compassionate release (ECF 60). On May 23, 2022, this Court docketed the motion and ordered the government to respond (Min. Order dated May 23, 2022).

**B. <u>Vaccine Information and Updates</u>**

As vaccines first became available in early 2021, the Bureau of Prisons (BOP) worked with the Centers for Disease Control and Prevention (CDC) and the federal government's COVID-19 Vaccine/Therapeutics Operation to ensure that the vaccines were made available as quickly as possible to all staff and inmates. By early February 2021, vaccine doses had been delivered to every BOP institution. BOP first offered the vaccine to full-time staff because staff members— who come and go between the facility and the community—presented a more likely vector for COVID-19 transmission into an institution. On September 9, 2021, President Biden issued Executive Orders 14042 and 14043, which require vaccinations of federal contractors and civil-service employees, respectively. *See* Exec. Order No. 14043, 86 Fed. Reg. 50,989 (Sept. 14, 2021); Exec. Order No. 14042, 86 Fed. Reg. 50,985 (Sept. 14, 2021). Hence, based on these Executive Orders, BOP required that staff be vaccinated, unless they fit within an approved exception. As of December 8, 2021, the federal government had "achieved 97.2% compliance with 92.5% of employees having received at least one COVID-19 vaccination dose." *See* https://www.whitehouse.gov/omb/briefing-room/2021/12/09/update-on-implementation-of-covid-%E2%81%A019-vaccination-requirement-for-federal-employees/.[1]

When vaccines became available, BOP offered them to inmates based on priority of need in accordance with CDC guidelines. In general, the vaccine was offered first to inmates over 75 years of age; then to inmates over 65 years of age; then to inmates of any age who present a condition identified by the CDC as presenting a risk of severe COVID-19 disease; and then to all inmates. BOP continues to follow this practice and offers vaccination to all incoming inmates. In

---

[1] Injunctions currently are in place regarding both Executive Orders and litigation in these matters is ongoing.

addition, inmates who initially refused vaccination may nonetheless receive vaccination if they change their minds. To date, BOP has administered over 319,000 doses to staff and inmates nationwide. *See* https://www.bop.gov/coronavirus/ (last accessed Jun. 3, 2022).[2]

The vaccines approved for use by the Food and Drug Administration (FDA) are effective in significantly reducing the rate of infection and dramatically reducing the risk of severe outcomes. In its Emergency Use Authorization memoranda, the FDA stated that the Pfizer-BioNTech vaccine was 95% effective in preventing COVID-19, including in study participants with medical comorbidities associated with high risk of severe COVID-19; the Moderna vaccine was approximately 95% effective in preventing COVID-19, including in study participants with medical comorbidities associated with high risk of severe COVID-19. The FDA gave final approval to the Pfizer vaccine in August 2021 and to the Moderna Vaccine in January 2022. *See* FDA News Release, "FDA Approves First COVID-19 Vaccine," https://www.fda.gov/news-events/press-announcements/fda-approves-first-covid-19-vaccine (Aug. 23, 2021); https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-takes-key-action-approving-second-covid-19-vaccine (Feb. 1, 2022).

Both the Pfizer and Moderna vaccines are effective in preventing COVID-19 among people of diverse age, sex, race, and ethnicity categories and among people with underlying medical conditions. *See, e.g.,* CDC, *Pfizer-BioNTech COVID-19 Vaccine (also known as COMIRNATY): Overview and Safety* (Apr. 1, 2022), https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines/Pfizer-BioNTech.html; Mark G. Thompson et al., *Effectiveness*

---

[2] Information on BOP's COVID-19 vaccination efforts, including a listing by facility that is updated daily, is found here: https://www.bop.gov/coronavirus/. The clinical guidance provided to BOP health service professionals is found here: https://www.bop.gov/resources/pdfs/covid_19_vaccine_guidance_v14_0_2021.pdf.

*of a Third Dose of mRNA Vaccines Against COVID-19–Associated Emergency Department and Urgent Care Encounters and Hospitalizations Among Adults During Periods of Delta and Omicron Variant Predominance — VISION Network, 10 States, August 2021–January 2022*, 71 Morbidity & Mortality Weekly Rep. 139 (2022), *available at* https://www.cdc.gov/mmwr/volumes/71/wr/pdfs/mm7104e3-H.pdf; Mark W. Tenforde et al, *Effectiveness of a Third Dose of Pfizer-BioNTech and Moderna Vaccines in Preventing COVID-19 Hospitalization Among Immunocompetent and Immunocompromised Adults — United States, August–December 2021*, 71 Morbidity & Mortality Weekly Rep. 118 (2022), *available at* https://www.cdc.gov/mmwr/volumes/71/wr/pdfs/mm7104a2-H.pdf.

In addition, "[c]ase and death rates for people fully vaccinated with any of the three vaccine types (Moderna, Pfizer-BioNTech, Johnson & Johnson's Janssen) were lower than for unvaccinated people." *See* https://covid.cdc.gov/covid-data-tracker/#rates-by-vaccine-status. The CDC also reports that, "[i]n addition to data from clinical trials, evidence from real-world vaccine effectiveness studies show that COVID-19 vaccines help protect against COVID-19 infections, with or without symptoms (asymptomatic infections). Vaccine effectiveness against hospitalizations has remained relatively high over time, although it tends to be slightly lower for older adults and for people with weakened immune systems." *See* https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/work.html (last accessed May 1, 2022).

No vaccine is 100% effective. According to the CDC, however, "even when people who are fully vaccinated develop symptoms of COVID-19, they tend to be less severe than in people who are unvaccinated." https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/work.html. In April 2022, unvaccinated persons were 2.3 times more

likely to test positive for COVID-19 than vaccinated persons, and 10 times more likely to die from it. *See* CDC, Rates of COVID-19 Cases and Deaths by Vaccination Status, https://covid.cdc.gov/covid-data-tracker/#rates-by-vaccine-status (last accessed Jun. 3, 2022).

Importantly, the vaccines also have proven effective to date against variants. On this point, the CDC reports:

> New variants of the virus that causes COVID-19 are spreading in the United States and in other parts of the world. COVID-19 vaccines are effective against the Delta variant and other variants with widespread circulation in the United States. Current vaccines are expected to protect against severe illness, hospitalizations, and deaths due to infection with the Omicron variant.

https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/work.html.

Further, although initial studies suggest that the Omicron variant is more transmissible than previous variants, these studies also indicate that it carries a significantly lower risk of severe illness or death. *See* https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html ("Omicron infection generally causes less severe disease than infection with prior variants."). This is particularly true among vaccinated individuals. *See* Press Briefing by White House COVID-19 Response Team and Public Health Officials (Dec. 29, 2021), https://www.whitehouse.gov/briefing-room/press-briefings/2021/12/29/press-briefing-by-white-house-covid-19-response-team-and-public-health-officials-76 (Statement of Dr. Rochelle Walensky reporting continued increased efficacy of vaccines in preventing severe illness or death from omicron variant). Accordingly, the CDC has concluded that even with increased community spread of the Omicron variant and the increased likelihood of "breakthrough infections," "[c]urrent vaccines protect against severe illness, hospitalizations, and deaths due to infection with the Omicron variant." CDC, Omicron Variant: What You Need to Know, https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (accessed May 17,

2022). Since hitting a peak in late January 2022, COVID-19 cases, including cases stemming from the Omicron variant, have been in sharp decline. *See* https://covid.cdc.gov/covid-data-tracker/#trends_dailycases (last visited Apr. 18, 2022). And Dr. Ashish Jha, the White House COVID Response Coordinator, recently noted that, "hospitalizations are at the lowest level of the pandemic . . . and deaths are continuing to fall." https://www.whitehouse.gov/briefing-room/press-briefings/2022/04/26/press-briefing-by-press-secretary-jen-psaki-and-white-house-covid-19-response-coordinator-dr-ashish-jha/ (accessed Apr. 28. 2022).

Recently, the BA.2 subvariants of the Omicron variant became the dominant strains of COVID-19 in the United States, and presently account for approximately 98% of all cases in the United States. *See* CDC, Variant Proportions, https://covid.cdc.gov/covid-data-tracker/#variant-proportions (last visited May 17, 2022). The BA.2 subvariants have proven, in other countries,[3] to be more transmissible than the original Omicron variant of COVID-19, but do not result in more severe infections than the original Omicron variant; which, in turn, resulted in markedly less-severe infections than the previous variant, Delta. *See, e.g.*, Rochelle Walensky, Press Briefing by White House COVID-19 Response Team and Public Health Officials (Mar. 23, 2022), *available at* https://www.whitehouse.gov/briefing-room/press-briefings/2022/03/23/press-briefing-by-white-house-covid-19-response-team-and-public-health-officials-84 (noting, based on community spread of BA.2 variant in other countries, that "it does have increased transmission in comparison to the related BA.1 Omicron variant," but that "[a]s we're learning from our colleagues in Europe, Asia, and South Africa, where BA.2 has resulted in varied peaks of cases, there's no evidence that BA.2 variant results in more severe disease, nor does it appear to be more likely to evade our

---

[3] After a period of steady decline in case counts, community spread of the BA.2 subvariants is increasing. https://www.nytimes.com/live/2022/05/04/world/covid-19-mandates-vaccine-cases (last accessed May 17, 2022).

immune protection"); Jannik Fonager et al., *Molecular Epidemiology of the SARS-CoV-2 variant Omicron BA.2 sub-lineage in Denmark, 29 November 2021 to 2 January 2022*, Eurosurveillance, Mar. 10, 2022, *available at* https://www.eurosurveillance.org/content/10.2807/1560-7917.ES.2022.27.10.2200181 (finding that "BA.2 is not associated with increased severity of disease or hospitalization," consistent with Norway study "suggesting that BA.2 leads to an equally mild course of disease with COVID-19 as BA.1 compared with the Delta variant").[4]

Booster shots have been approved for use. *See* https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html.[5] Consistent with these recommendations, BOP policy now provides that inmates who are moderately to severely immunocompromised—unlike defendant— should be offered a third dose as part of their primary series vaccinations, and a fourth, booster

---

[4] As previously noted, the Omicron variant spread "more easily than earlier variants of the virus that cause COVID-19, including the Delta variant," but it has proved to cause "less severe disease than infection with prior variants." CDC, *Omicron Variant: What You Need to Know* (Mar. 29, 2022), https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html. A cohort study of confirmed Omicron-variant cases in England showed "a 59% lower risk of hospital admission, a 44% lower risk of any hospital attendance, and a 69% lower risk of death than that of confirmed delta cases." *See* Tommy Nyberg et al., *Comparative Analysis of the Risks of Hospitalisation and Death Associated with SARS-CoV-2 Omicron (B.1.1.529) and Delta (B.1.617.2) Variants in England: a Cohort Study*, 399 The Lancet 1303, 1309 (Mar. 16, 2022), *available at* https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(22)00462-7/fulltext. This finding that Omicron is less severe than previous strains is a consistent one. *See generally, e.g.*, A. Danielle Iuliano et al., *Trends in Disease Severity and Health Care Utilization During the Early Omicron Variant Period Compared with Previous SARS-CoV-2 High Transmission Periods — United States, December 2020–January 2022*, 71 Morbidity & Mortality Weekly Rep. 146 (2022), *available at* https://www.cdc.gov/mmwr/volumes/71/wr/pdfs/mm7104e4-H.pdf; Matthew E. Modes et al., *Clinical Characteristics and Outcomes Among Adults Hospitalized with Laboratory-Confirmed SARS-CoV-2 Infection During Periods of B.1.617.2 (Delta) and B.1.1.529 (Omicron) Variant Predominance — One Hospital, California, July 15–September 23, 2021, and December 21, 2021–January 27, 2022*, 71 Morbidity and Mortality Weekly Rep. 217 (2022), https://www.cdc.gov/mmwr/volumes/71/wr/pdfs/mm7106e2-H.pdf.

[5] In November 2021, the FDA approved boosters for everyone 18 years and older who received two doses of the Pfizer-BioNTech or Moderna COVID-19 vaccines more than six months ago. *See* https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-expands-eligibility-covid-19-vaccine-boosters. In January 2022, the FDA approved the use of single booster dose of the Pfizer vaccine to children as young as 12. *See* https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-takes-multiple-actions-expand-use-pfizer-biontech-covid-19-vaccine.

dose at least three months later.  *See* BOP, COVID-19 Vaccine Guidance 1, 5–6 (Feb. 25, 2022), available at https://www.bop.gov/resources/pdfs/covid_19_vaccine_guidance_v17.pdf.   Other inmates who received the Pfizer-BioNTech or Moderna vaccine should be offered their third, booster dose at least five months after their second dose of their primary series vaccination.  *See id.* at 18. Prisoners who otherwise qualify can receive a booster dose upon request. *See id.* at 22 ("Vaccines are readily available at all facilities. Vaccine administration should be made available for 'walk-ins' or during sick-call clinics. . . . For inmates, using BEMR scheduler is the preferred method to schedule subsequent vaccine doses.").[6]

### C. Information Regarding BOP

As the Court is aware, from the outset of the pandemic, the BOP has made extensive changes to its operations, based on a plan that was prepared over many years, and refined in early 2020 in consultation with the CDC and the World Health Organization. Those efforts continue.

The government recognizes that the COVID-19 case rate at a particular institution may change at any time. We therefore focus primarily on considerations specific to defendant. But BOP's success at many institutions in limiting the spread of the virus, and in stemming outbreaks when they occur, provides an important backdrop for defendant's motion.

Under current practices, BOP institutions operate at one of three operational levels (Level 1, Level 2, Level 3). The institutions determine their operational level "based on the facilities' COVID-19 medical isolation rate, combined percentage of staff and inmate completed vaccinations series, and their respective community transmission rates." *See* https://www.bop.gov/coronavirus/covid19_modified_operations_guide.jsp.   Medical   isolation,

---

[6] In addition, the BOP has informed us that inmates may request to be vaccinated against COVID-19 (or receive a booster if appropriate) and that BOP will honor the request as soon as practicable.

contact tracing and PPE appropriate for each setting are in effect for all three levels. Under Level 1 operations, fewer modifications are necessary; under Level 3 operations, the BOP's COVID-19 pandemic plan is followed.[7] Many other modifications are in place, regardless of the operation level. For example, "inmates are tested for SARS-CoV-2 when they are symptomatic, asymptomatic but exposed, during movements, and when surveillance is needed." *Id.* Inmates who are not fully vaccinated must complete a 14-day quarantine as new intakes or if they have a known or suspected exposure to COVID-19. Staff and inmates who are not fully vaccinated should be screened at least weekly when community transmission is substantial or high, and face coverings are to be worn at all times indoors, regardless of vaccination status. *Id*.

BOP's efforts have been fruitful. Nonetheless, some inmates inevitably will be infected and some of that cohort may succumb, just as in the population at large. However, the rate of deaths in federal prisons as a whole has been lower than that in the general U.S. population, a notable achievement given the known risks of viral spread in a congregate prison setting.

In addition, acting under the authority granted in the CARES Act, BOP has transferred thousands of inmates to home confinement, focusing on nonviolent offenders who have served the majority of their sentences. This initiative, combined with the reduced number of new arrivals during the pandemic and the ordinary release of prisoners upon completion of their sentences, has led to a dramatic decrease in the total BOP population, which in turn has increased opportunities for social distancing and reduced the strain on BOP resources. The total BOP population, which

---

[7] The Court can find the overall number of BOP facilities at a particular operational level, as well as the operational level for a particular BOP institution, here: https://www.bop.gov/coronavirus/index.jsp.

was approximately 170,000 at the beginning of the pandemic, is now approximately 10% lower, at the lowest level in decades.[8]

## II.   ARGUMENT

The government respectfully opposes defendant's request for compassionate release. As an initial matter, defendant has not exhausted his administrative remedies as required. Even if he had, defendant is fully vaccinated with an effective COVID-19 vaccine. Relatedly, defendant fails two establish one of the two medical conditions he claims. Additionally, the § 3553(a) factors do not favor a sentence reduction.

### A. Legal Principles for Compassionate Release Motions

This matter comes before the Court on defendant's motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A). Before the enactment of the First Step Act in 2018, only the Bureau of Prisons could seek compassionate release for a defendant. *See United States v. Long*, 997 F.3d 342, 348 (D.C. Cir. 2021). With the passage of the First Step Act, however, defendants now may file for compassionate release on their own behalf. *See id.* As amended by the First Step Act, § 3582(c)(1)(A) now states in relevant part as follows:

> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of

---

[8] Currently, the BOP has over 6,100 inmates on home confinement. The total number of inmates placed in home confinement from March 26, 2020, to the present (including inmates who have completed service of their sentence) is over 42,000. *See* Federal Bureau of Prisons, COVID-19 Home Confinement Information, at https://www.bop.gov/coronavirus/ (accessed Jun. 3, 2022).

> imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that –
>
> (i)     extraordinary and compelling reasons warrant such a reduction; . . .
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A).[9]

In *United States v. Long*, 997 F.3d 342, 347 (D.C. Cir. 2021), the D.C. Circuit held that the policy statement set forth at U.S.S.G. § 1B1.13 "is not applicable to compassionate release motions filed by defendants." Accordingly, the Court is not bound by § 1B1.13 in deciding whether this defendant, who has filed for compassionate release, is entitled to early release under 18 U.S.C. § 3582(c)(1)(A). The government notes here that a number of the Circuits that have concluded that § 1B1.13 is not binding in connection with motions filed by defendants also have recognized that the policy statement continues to provide important "guideposts," *United States v. McGee*, 992 F.3d 1035, 1045 (10th Cir. 2021); *see United States v. Thompson*, 984 F.3d 431, 433 (5th Cir. 2021) ("Although not dispositive, the commentary to the United States Sentencing Guidelines ("U.S.S.G.") § 1B1.13 informs our analysis as to what reasons may be sufficiently 'extraordinary and compelling' to merit compassionate release."); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020) ("The substantive aspects of the Sentencing Commission's analysis in § 1B1.13 and its Application Notes provide a working definition of 'extraordinary and compelling reasons'; a judge who strikes off on a different path risks an appellate holding that judicial discretion has been abused."); *United States v. Aruda*, 993 F.3d 797, 802 (9th Cir. 2021); *United States v. High*,

---

[9] Under § 3582(c)(1)(A)(ii), the Court may grant compassionate release to a defendant who has, among other things, served at least 30 years pursuant to a sentence imposed under 18 U.S.C. § 3559(c). Defendant is not serving a sentence under this provision and thus seeks early release under § 3582(c)(1)(A)(i).

997 F.3d 181, 186 (4th Cir. 2021) (while the Fourth Circuit holds that "§ 1B1.13 is not applicable to *defendant-filed* motions under § 3582(c)," the court recognizes that "it defines, in the medical context, the same substantive term that applies to *BOP-filed* motions. One might reasonably believe therefore that the term 'extraordinary and compelling reasons' will be defined the same for defendant-filed motions." (emphasis in original)).

As the movant, defendant bears the burden to establish that early release is warranted. *See United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014). To do so, defendant must show (a) that he has exhausted his right to appeal the BOP's failure to seek compassionate release on his behalf or that 30 days have lapsed since he sought a reduction in sentence from the warden of his BOP facility; (b) the existence of extraordinary and compelling circumstances sufficient to warrant his early release; and (c) that weighing the applicable § 3553(a) factors counsel in favor of early release.

## B. **Defendant Has Not Shown that He is Entitled to Compassionate Release.**

This Court should deny defendant's request for compassionate release because he has not exhausted his administrative remedies. Further, even assuming *arguendo* that defendant's medical conditions would otherwise constitute an extraordinary and compelling reason, defendant is fully vaccinated against COVID-19 and therefore cannot establish an extraordinary and compelling reason for early release based on the risk of severe illness or death from COVID-19. Additionally, the § 3553(a) factors weigh against release.

### *1. Defendant Has Not Exhausted Administrative Remedies.*

As noted above, 18 U.S.C. § 3582(c) provides that a court may not modify a term of imprisonment once it has been imposed unless it does so "upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all

14

administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier. . . ." 18 § 3582(c)(1)(A). Thus, a "court may consider a defendant's [compassionate-release] motion only after the defendant has" exhausted those remedies. *United States v. Morales*, No. 06-CR-248-4 (JDB), 2021 WL 4622461, at *2 (D.D.C. Oct. 7, 2021). "The statute's exhaustion requirement is mandatory." *Id.* (citing *United States v. Alam*, 960 F.3d 831, 833-36 (6th Cir. 2020); *United States v. Douglas*, No. 10-CR-171-4 (JDB), 2020 WL 5816244, at *2 (D.D.C. Sept. 30, 2020) (collecting cases)).[10]

Here, defendant acknowledges that he has not exhausted his administrative remedies (see Mot. at 4-5). Instead, he claims that the Court can "dispense with" these requirements because there are "exceptional circumstances of peculiar urgency," due to the COVID-19 pandemic and that there "is no valid reason to wait 30 days for the formal denial" from BOP (*id.* at 4-5 (citation omitted)). This argument runs contrary to settled precedent establishing that the exhaustion requirement is mandatory—even in the context of the COVID-19 pandemic—and should be summarily rejected. *See, e.g.*, *Alam*, 960 F.3d at 835 (rejecting inmate's request to "innovate an equitable exception to this [exhaustion] requirement to account for irreparable harm or futility," and noting that "Congress made compassionate release available only to elderly prisoners and those with 'extraordinary and compelling' reasons for release"; the fact that "[f]or such prisoners, time usually will be of the essence," counsels against implying an "irreparable harm" exception to

---

[10] To be clear, we view this requirement as a mandatory claims-processing rule, not a jurisdictional bar to this Court's consideration of the claims. *See United States v. Franco*, 973 F.3d 465, 467 (5th Cir.), *cert. denied*, 141 S. Ct. 920 (2020) ("the requirement [to exhaust administrative remedies] is *not* jurisdictional, but [] it *is* mandatory") (emphasis in original). The government hereby invokes this mandatory rule.

the administrative-exhaustion requirement). Defendant's motion fails because he did not exhaust his administrative remedies as required before filing it.

### 2. Defendant Has Not Shown an Extraordinary and Compelling Reason for a Sentence Reduction.

Defendant has not demonstrated an "extraordinary and compelling reason" within the meaning of 18 U.S.C. § 3582(c)(1)(A)(i). As explained above, a court can grant a sentence reduction, after considering the 18 U.S.C. § 3553(a) factors, only if it determines that "extraordinary and compelling reasons" justify the reduction. 18 U.S.C. § 3582(c)(1)(A)(i).

### a. COVID-19 Is Not an Extraordinary and Compelling Reason for this Vaccinated Inmate.

We note at the outset that the mere existence of the COVID-19 pandemic, which poses a general threat to every non-immune person, cannot alone provide a basis for a sentence reduction. As the D.C. Circuit recently found, "a pandemic affecting not only the entire prison population, but the entire world, does not constitute an extraordinary and compelling reason." *United States v. Jackson*, 26 F.4th 994, 1002 (D.C. Cir. 2022); *see also United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release"); *accord United States v. Stephens*, No. 17-243 (BAH), 2021 WL 663184, at *2 (Feb. 19, 2021). Section 3582(c)(1)(A) contemplates sentence reductions for specific individuals, not the widespread prophylactic release of inmates and the modification of lawfully imposed sentences to deal with a world-wide viral pandemic.

According to guidance from the Centers for Disease Control and Prevention ("CDC"), adults of any age with certain conditions can be more likely to get severely ill from COVID-19. The conditions currently identified by the CDC include certain heart conditions. *See*

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Jun. 3, 2022) ("heart conditions such as heart failure, coronary artery disease, cardiomyopathies,[11] and possibly high blood pressure (hypertension) can make you more likely to get very sick from COVID-19").[12]

As this Court is aware, from the outset of the COVID-19 pandemic, the United States has followed CDC guidance. We continue to do so. Accordingly, during the pandemic, the United States has acknowledged that an inmate who—unlike defendant—has not been offered a vaccine, who presents one of the medical risk factors on the CDC list as confirmed by medical records, and who is not expected to recover from that condition, presents an extraordinary and compelling reason, even if that condition in ordinary times would not necessarily suffice to establish an extraordinary and compelling reason. For purposes of this motion, the government does not dispute that defendant has at least one such condition, namely hypertension.

Putting aside hypertension, defendant also claims that he has "heart disease" (Mot. at 3). But a review of defendant's medical records reveals that he has not been diagnosed with heart disease or with any other heart condition that is recognized to increase one's vulnerability to COVID-19 under CDC guidance. A list of defendant's current and resolved medical conditions (see Gov. Ex. 3 at 42-46), reveals no diagnosis for heart disease. Indeed, notes from a May 2021 medical encounter provide an overview of defendant's medical conditions and state that defendant

---

[11] "Cardiomyopathy . . . is a disease of the heart muscle that makes it harder for the heart to pump blood to the rest of the body." https://www.mayoclinic.org/diseases-conditions/cardiomyopathy/symptoms-causes/syc-20370709 (last accessed May 26, 2022).

[12] The CDC's guidance notes that this list does not include all medical conditions that could make a person more likely to get severely ill; thus, rare medical conditions are not included.

has "[n]o . . . Hx of heart disease, Hx of Heart Surgery, [or] Hx [of] Murmur" (Gov. Ex. 2 at 3).[13]
The only heart condition listed as a current condition in defendant's medical records is bradycardia,
or slow heart rate (Gov. Ex. 3 at 43). *See* Mayo Clinic, "Bradycardia," *available at*
https://www.mayoclinic.org/diseases-conditions/bradycardia/symptoms-causes/syc-20355474
(last accessed Jun. 3, 2022). Assuming this is the condition to which defendant refers in his motion,
it is not one of the heart conditions recognized by the CDC to increase one's risk of severe illness
or death from COVID-19 infection. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-
precautions/people-with-medical-conditions.html.

In sum, defendant's medical records establish that he has one condition, hypertension, that
constitutes a risk factor under CDC guidance. However, defendant was vaccinated with two doses
of the Moderna COVID-19 vaccine in March 2021 (Gov. Ex. 2 at 36). Hence, defendant has been
fully vaccinated. Defendant failed to inform the Court of his vaccination status in his motion, even
though the motion is based on COVID-19. To the extent defendant contends that he has established
and extraordinary and compelling reason for release despite his vaccinated status, we respectfully
disagree.

As noted *supra* in Section I.B, the available COVID-19 vaccines reduce the risk of
infection and, more importantly, greatly reduce the risk of suffering severe health complications
from the virus. Thus, as the Seventh Circuit has explained:

> [F]or the many prisoners who seek release based on the special risks created by
> COVID-19 for people living in close quarters, vaccines offer relief far more
> effective than a judicial order. A prisoner who can show that he is unable to receive
> or benefit from a vaccine still may turn to this statute, but, for the vast majority of
> prisoners, the availability of a vaccine makes it impossible to conclude that the risk
> of COVID-19 is an "extraordinary and compelling" reason for immediate release.

---

[13] In this context, we read "Hx" to be an abbreviation for "history." *See* OSHA, "Health Care Practitioner's
Abbreviations," *available at* https://www.osha.gov/sites/default/files/CPL_2-0_131fig2-4.pdf (last
accessed Jun. 3, 2022).

*United States v. Broadfield*, 5 F.4th 801, 803 (7th Cir. 2021).[14] Numerous judges in this district

likewise "have now recognized that 'the remarkable effectiveness of these vaccines raises an

extremely high bar to establishing extraordinary and compelling reasons for a sentence reduction

based on the risk of contracting COVID-19.'" *United States v. Sumler*, 2021 WL 6134594, at *26

(D.D.C. Dec. 28, 2021) (BAH) (quoting *United States v. Clark*, No. 10-cr-0133 (PLF), 2021 WL

5630795, at *4 (D.D.C. Dec. 1, 2021) (collecting cases)); *see United States v. Wilson*, No. CR 96-

319-01, 2021 WL 5292457, at *4 (D.D.C. Aug. 6, 2021) (CKK) ("This Court finds that the

---

[14] *See also United States v. Lemons*, 15 F.4th 747, 751 (6th Cir. 2021) (declining to find that defendant had shown an extraordinary and compelling reason justifying sentence reduction because he received the first dose of the vaccine and the likelihood of contracting COVID-19 and the associated risks of contracting the virus are significantly reduced following full vaccination; "Lemon's access to the COVID-19 vaccine substantially undermines his request for a sentence reduction. To that end we agree with the Seventh Circuit [*United States v. Broadfield*, 5 F.4th 801 (7th Cir. 2021)] that a defendant's incarceration during the COVID-19 pandemic–when the defendant has access to the COVID-19 vaccine–does not present an "extraordinary and compelling reason" warranting sentence reduction."); *United States v. Jefferson*, No. 21-2020, 2021 U.S. App. LEXIS 28572, at *4, 8 (3rd Cir. Sept. 21, 2021) (affirming the district court's finding that Jefferson did not demonstrate extraordinary or compelling reasons because he had contracted and recovered from COVID-19 and had been vaccinated which made his case for release based on the COVID-19 threat "much less compelling that it had been initially"); *United States v. Burgard*, 857 Fed. Appx. 254, 255-56 (7th Cir. Aug. 26, 2021) (affirming a finding that the defendant lacked extraordinary and compelling reasons for relief, despite the district court's error of confining itself to the parameters of a non-binding policy statement in the Sentencing Guidelines, because "the widespread availability of the COVID-19 vaccine within the Federal Bureau of Prisons likely eliminates Burgard's stated reason for release" and "nothing in the record suggests that Burgard is unable, medically or otherwise, to receive the vaccine"); *Morales*, 2021 WL 4622461, at *6 (D.D.C. Oct. 7, 2021) (reasoning that based on the effectiveness of the Johnson & Johnson vaccination defendant received he was unable to prove an extraordinary and compelling reason for release; "This substantial protection against COVID–and especially against life-threatening courses of the disease–seriously undermines Mr. Morales's purported 'extraordinary and compelling reason' for release."); *United States v. Johnson*, No. 02-CR-310 (JDB), 2021 U.S. Dist. LEXIS 159315, at *18 (D.D.C. Aug. 23, 2021) (finding that defendant has failed to show an extraordinary and compelling reason for release since defendant is presumably fully vaccinated, based on the date of his first dose of the Moderna COVID-19 vaccine, and "given the efficacy of the Moderna vaccine, the Court does not find that releasing Johnson from prison is warranted to mitigate the risk of COVID-19."); *United States v. Martinez*, No. 05-CR-445-1 (RCL), 2021 WL 2322456, at *2 (D.D.C. June 7, 2021) ("[A]lthough Martinez may have underlying conditions that could increase his risk of severe illness from the virus, the fact that he has been fully vaccinated mitigates that risk almost entirely . . . . Accordingly, the Court finds that the COVID-19 pandemic does not pose an 'extraordinary and compelling' reason justifying a reduction in Martinez's sentence.").

increased risk of COVID-19 due to Defendant's age and medical conditions of hypertension and obesity has been mitigated by the fact that Mr. Wilson has been vaccinated as well as the fact that there are no known COVID-19 cases at FCI Petersburg, where Mr. Wilson is incarcerated.").

Here, defendant has not even alleged, let alone proven, that he is unable to benefit from the vaccine. Indeed, his motion entirely fails to mention his vaccination status, much less explain how defendant remains significantly vulnerable to COVID-19 despite his vaccination.[15] In short, defendant failed to establish that the combination of his health condition and the COVID-19 pandemic constitute an extraordinary and compelling reason for a sentence reduction. The Court should deny his motion on this basis alone.

Relatedly, defendant alleges that his facility "fail[ed] to provide adequate medical care," and complains of the "lack of adequate sanitation, close quarters, and limited medical capacity" there (Mot at 3, 5). As an initial matter, the proper way to raise such claims is to file a civil suit against his current jailer in his district of confinement. *See, e.g.*, *United States v. Folse*, 2016 WL 3996386, at *15 (D.N.M. June 15, 2016) ("The general rule is that a defendant must file a separate civil action to address his conditions of confinement."); *United States v. Luong*, 2009 WL 2852111, at *1 (E.D. Cal. Sept. 2, 2009) ("As several courts have recognized, the proper procedure to redress a defendant's grievances regarding treatment within a jail or prison is to file a civil suit against the relevant parties . . . rather than a motion in his criminal case."); *United States v. Wells*, 2007 WL 3025082, at *2 (W.D. Ky. Oct. 15, 2007) ("[T]o the extent Wells is challenging his condition of confinement by claiming that his life is in danger, the appropriate course would be to file a civil action against the alleged wrongdoers, not a Rule 60(b) motion in his criminal action.").

---

[15] Defendant also fails to mention that he contracted and recovered from COVID-19 in January 2021, prior to vaccination (see Inmate Profile, Gov. Ex. 6 at 2).

Where a claim challenging conditions of confinement is erroneously filed in a defendant's criminal case, the trial court should deny the claim. *See, e.g., United States v. Banks*, 422 F. App'x 137, 138 n.1 (3d Cir. 2011) (per curiam) ("We agree with the District Court that a motion filed in his criminal case was not the proper vehicle for raising the claims about prison conditions contained in that motion."); *United States v. Garcia*, 470 F.3d 1001, 1003 (10th Cir. 2006) (noting that, because the defendants' "challenge[s] to the conditions of confinement . . . were raised in motions filed in their respective criminal cases . . . they were properly denied by the district court"). Accordingly, the Court should summarily deny these claims.

Even if these claims were properly before the Court, defendant's attempts to characterize his facility as overrun with COVID-19 are belied by the numbers. As of June 3, 2022, FCI Forrest City Low, where defendant is incarcerated, had approximately 1,700 inmates, 200 of whom are at the minimum-security camp. *See* https://www.bop.gov/locations/institutions/for/ (last accessed Jun. 3, 2022). Yet there is only one confirmed active COVID-19 case amongst the staff and no confirmed active cases amongst the inmates. *See* https://www.bop.gov/coronavirus/index.jsp (use graphic and mouseover the marker for FCC Forrest City in Arkansas) (last accessed Jun. 6, 2022). Defendant fails to establish an extraordinary and compelling reason on these grounds.

### 3.   *The 18 U.S.C. § 3553(a) Factors Weigh Against Release.*

This Court must also consider the 18 U.S.C. § 3553(a) factors, as "applicable," as part of its analysis. *See* 18 U.S.C. § 3582(c)(1)(A); *United States v. Chambliss*, 948 F.3d 691, 694 (5th Cir. 2020). The factors that the Court must consider under § 3553(a) (which sets forth factors the Court must consider at sentencing) include "the nature and circumstances of the offense," "the history and characteristics of the defendant," and also the need for a sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the

offense;" "to afford adequate deterrence to criminal conduct;" "to protect the public from further crimes of the defendant;" and "to provide the defendant with needed educational or vocational training, medical care, and other correctional treatment in the most effective manner."

Even where a defendant has established an extraordinary and compelling reason for release, the Court may reduce his sentence only if the balance of the § 3553(a) factors favor release. *See United States v. Edwards*, No. 03-234 (JDP), 2020 WL 5518322 at *4 (D.D.C. September 12, 2020) ("[E]ven if Mr. Edwards <u>had</u> presented "extraordinary and compelling reasons" for release, the Court may reduce his term of imprisonment only if the balance of the § 3553(a) factors favor his release." (emphasis in original)); *see also United States v. Holroyd*, 464 F. Supp. 3d 14, 19 (D.D.C. 2020) (TNM) ("If a defendant still poses a danger to the community or if the balance of factors under § 3553(a) favor continued imprisonment, these are independent reasons to deny a motion for compassionate release."); *United States v. Sears*, 19-cr-21, 2020 WL 3250717 at *2 (D.D.C. June 16, 2020) (denying compassionate release to inmate with diabetes, hypertension and asthma who had established extraordinary and compelling reasons because "this Court does not, and cannot, find that a reduction in [Defendant]'s term of imprisonment is consistent with the § 3553(a) factors at this time").

The Court assessed the 18 U.S.C. § 3553(a) factors prior to and at sentencing in July 2014.[16] As to defendant's recidivism, the Court noted that defendant continued to reoffend into his

---

[16] The Court presumably considered the § 3553(a) factors when it rejected the parties' initial plea agreement pursuant to Rule 11(c)(1)(C) that called for a sentence of 15 years, which was six months below the bottom of the applicable Guidelines range (see ECF 18 at 1-2 (requesting the Court to accept the proposed plea offer); Gov. Ex. 4 at 4 (acknowledging rejection of that plea agreement)).

fifties despite having developed "a long criminal history" (Sentencing Transcript, Gov. Ex. 4 at 8).
The Court found it

> unfortunate that [defendant], for whatever reason, was just not accepting of the
> lessons he should have learned a long, long time ago, and here he finds himself in
> his fifties right back where he had been before, dealing drugs, using weapons. And
> it is as if he either didn't learn it or was, frankly, saying the hell with it.

(*Id.*). Defendant sought a downward variance from the bottom of his 188- to 235-month
Guidelines range to the statutory minimum of 180 months (*id.* at 9), but the Court could not, "in
good conscience, vary downward in this Case," and instead sentenced defendant to a Guidelines-
compliant term of 188 months on incarceration (*id.* at 15).

"[T]he nature and circumstances of the offense," "the history and characteristics of the
defendant," and the need for a sentence "to reflect the seriousness of the offense, to promote respect
for the law, [] to provide just punishment for the offense," "to afford adequate deterrence to
criminal conduct," and "to protect the public from further crimes of the defendant," all weigh
against compassionate release. The offense conduct was serious. Defendant—an admitted drug
dealer, multiple-time prior convict, and parolee—had amassed multiple firearms, ammunition,
large amounts of U.S. currency, and a significant amount of controlled substances in his apartment.
Though there was no evidence that defendant fired or brandished the weapons, his possessing
them, especially in conjunction with the other contraband, was dangerous. It was clear that
defendant was operating as an armed drug dealer. Against this context, defendant's assertion that
he is "a non-violent offender" (Mot. at 4), falls flat.

Defendant's criminal history weighs heavily against release. Defendant had over 10 prior
convictions in D.C. and Maryland at the time he committed this offense (see Presentence Report

(PSR), ECF 25 at 8-18).[17] These included multiple convictions for armed robbery and possession with intent to distribute controlled substances (*id.* at 9-15). Defendant had enough prior violent felony and serious drug convictions to qualify for sentencing under the Armed Career Criminal Act, 18 U.S.C. § 924(e), which triggered a 15-year mandatory minimum sentence. Additionally, the police approached defendant because he had an active parole-violation warrant in one of his armed robbery cases (*id.* at 5). He had been revoked on parole multiple times in the years leading up to this offense (see, e.g., *id.* at 9). In short, defendant's conviction in this case came after decades of leading a life marked by serious and violent criminal offenses and failing to abide by conditions of parole. Defendant failed to be deterred by the threat of criminal sanction in those many cases, and, as the Court aptly noted, failed to learn from his prior misconduct. The sentence the Court imposed was thus necessary to provide just punishment and prevent defendant from committing additional crimes.

Defendant claims that he "has been an exceptionally well-mannered inmate with no disciplinary issues to speak of" (Mot. at 4). We agree that defendant's lack of recent disciplinary incidents weighs in his favor.

---

[17] The government previously summarized defendant's prior convictions (see ECF 18 at 5) as follows: (1) PPW Gun on March 20, 1986 (D.C. Superior Court Case No. 1985-FEL6677; sentenced to 200 days; on parole until July 4, 2017); (2) Attempted Possession of Cocaine on August 30, 2010 (D.C. Superior Court Case No. 2010-CMD-13141; sentenced to 45 days' confinement); (3) Possession of Cocaine on July 22, 2010 (D.C. Superior Court Case No. 2010- CMD-3209; sentenced to 150 days' confinement); (4) Misdemeanor Sex Abuse on May 7, 2003 (D.C. Superior Court Case No. 2003-DVM-343; sentenced to 180 days' incarceration); (5) Misdemeanor Domestic Assault on May 7, 2003 (D.C. Superior Court Case No. 2003-DVM343; sentenced to 180 days' incarceration); (6) Possession with Intent to Distribute PCP on June 11, 1991 (D.C. Superior Court Case No. 1990-FEL-13027; sentenced to 3 years to 9 years' incarceration); (7) Possession with Intent to Distribute Marijuana on June 11, 1991 (D.C. Superior Court Case No. 1990-FEL-13027; sentenced to 1 year incarceration); (8) Robbery with a Deadly Weapon on January 6, 1992 (Prince George's County, MD Case No. CT890556X; sentenced to 15 years' confinement); (9) Armed Robbery June 14, 1988 (D.C. Superior Court Case No. 1983-FEL-6228; sentenced to 40 months to 11 years' incarceration); (10) Robbery with a Dangerous Weapon on March 2, 1987 (Prince George's County, MD Case No. CT85905A; sentence unknown); and (11) Petit Larceny on May 20, 1981 (D.C. Superior Court Case No. 1981-CMD-984; sentenced to 1 year; $100 Fine).

24

Defendant obtained his GED while incarcerated after logging over 1,400 hours between 2005 and 2016 (Education Transcript, Gov. Ex. 5 at 1). BOP policy typically requires that inmates work toward a GED for those who have not graduated from high school. *See* Program Statement § 544.70 Purpose and Scope. ("Except as provided for in § 544.71, an inmate confined in a federal institution who does not have a verified General Educational Development (GED) credential or high school diploma is required to attend an adult literacy program for a minimum of 240 instructional hours or until a GED is achieved, whichever occurs first."), *available at* https://www.bop.gov/policy/progstat/5350_028.pdf (last accessed Jun. 14, 2022). Hence, the fact that defendant has attained a GED should not be viewed as a sign of rehabilitation because he has simply done what is required of him. Since earning his GED, defendant's programming has waned significantly. He earned 60 hours though a correspondence course in 2018, but has no recorded programming whatsoever since April 2018 (see Gov. Ex. 5 at 1). To the extent this factor weighs in favor of release, it is significantly outweighed by the other salient factors discussed above.

Defendant claims that "he has a re-entry plan that will prevent recidivism and ensure his health and safety as well as the public's health and safety" (Mot. at 4). But his only explanation of what that plan entails is that he "would join the community in the DC area and will get a job at the Federal Express warehouse" (*id.*). This vague description of housing and employment is not an adequate release plan, and it does not favor release. *See United States v. Allison*, 2020 WL 3077150, *4 (W.D. Wash. June 10, 2020) ("An appropriate release plan is essential to ensure that a defendant actually has a safe place to live and access to health care in these difficult times. Shortening a defendant's sentence where there is no adequate release plan offers no benefit to the health of the inmate and in the process likely further endangers the community into which the

defendant is release[d]"). The § 3553(a) factors do not favor release and so defendant's motion fails for this additional reason.

## <u>CONCLUSION</u>

For the reasons above, and based on the entire record, defendant has not met his burden to show that he is entitled to a sentence reduction. Accordingly, the Court should summarily deny defendant's motion.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

MARGARET J. CHRISS
Assistant United States Attorney
Chief, Special Proceedings Division
D.C. Bar No. 452403

PETER S. SMITH
Assistant United States Attorney
Deputy Chief, Special Proceedings Division
D.C. Bar No. 465131

By:   /s/_____
DANIEL HONOLD
Assistant United States Attorney
N.Y. Bar No. 5406715
Special Proceedings Division
601 D Street, NW
Washington, D.C. 20530
Daniel.Honold@usdoj.gov
(202) 252-6898

## CERTIFICATE OF SERVICE

I hereby certify that on June 14, 2022, I caused a copy of the foregoing to be mailed to:

ROGER REDRICK
Reg. No. 27118-016
FCI Forrest City Low
Federal Correctional Institution
P.O. Box 9000
Forrest City, AR  72336

/s/_____
DANIEL HONOLD
Assistant United States Attorney